**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TACO BELL CORPORATION,
            *Plaintiff-Appellant,*

v.

TBWA CHIAT/DAY INC.,
Erroneously Sued as TBWA
Worldwide Inc.,
            *Defendant-Appellee.*

No. 07-56532

D.C. No.
CV-04-07019-GPS

TACO BELL CORPORATION,
            *Plaintiff-Appellant,*

v.

TBWA CHIAT/DAY INC.,
            *Defendant-Appellee.*

No. 08-55441

D.C. No.
2:04-cv-07019-
GPS-CW

OPINION

Appeal from the United States District Court
for the Central District of California
George P. Schiavelli, District Judge, Presiding

Argued and Submitted
December 9, 2008—Pasadena, California

Filed January 23, 2009

Before: Harry Pregerson, Dorothy W. Nelson and
David R. Thompson, Circuit Judges.

Opinion by Judge Thompson

**COUNSEL**

Robert J. Harris, Chicago, Illinois, for the plaintiff-appellant.

Paul F. Corcoran, New York, New York, for the defendant-appellee.

**OPINION**

THOMPSON, Senior Circuit Judge:

Taco Bell Corp. ("Taco Bell") appeals the district court's summary judgment in favor of its former advertising agency, TBWA Worldwide, Inc. ("TBWA"), in Taco Bell's lawsuit seeking indemnification. This case follows a judgment issued against Taco Bell in the federal district court for the Western District of Michigan for breach by Taco Bell of an implied contract for using a third party's Chihuahua character in its advertising developed by TBWA. Taco Bell sought indemnification from TBWA on the ground that the liability Taco Bell incurred in favor of the third party was caused by TBWA.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.  Background

In June 1996, Ed Alfaro, a licensing manager at Taco Bell, attended a trade show in New York where he first discovered a cartoon depiction of a Chihuahua dog character ("Psycho Chihuahua") being marketed by its creators, Tom Rinks and Joe Shields of Wrench LLC, a Michigan corporation (collectively, "Wrench"). Alfaro told Rinks and Shields that he wanted to explore the use of Psycho Chihuahua by Taco Bell.

During the Summer and Fall of 1996, Wrench provided Taco Bell with goods bearing Psycho Chihuahua's image. From that time through June 1997, Alfaro tried to build support within Taco Bell for its use of Psycho Chihuahua in its advertising. He showed the goods to Taco Bell's senior managers and advertising agency at that time, Bozell Worldwide ("Bozell"). Taco Bell conducted a focus group study which included Psycho Chihuahua and several other designs. Alfaro reported to a senior Taco Bell executive that Psycho Chihuahua was the most popular out of all the designs.

In November 1996, Taco Bell and Wrench's licensing agent, Strategy Licensing, discussed the possible use of Psycho Chihuahua as Taco Bell's mascot and Taco Bell requested that Strategy Licensing submit a proposal on financial terms for the use of Psycho Chihuahua. On November 18, 1996, Strategy Licensing submitted a proposal but Taco Bell did not accept it. Discussions continued about Taco Bell's possible use of Psycho Chihuahua and Taco Bell understood that if it decided to use that character, Taco Bell would have to pay Wrench for such use.

In February 1997, Taco Bell's then-parent company, Pepsi Co., made a presentation to Taco Bell's marketing department regarding the possibility of using Psycho Chihuahua in a Taco Bell "Cinco de Mayo" promotion. Taco Bell then conducted additional focus group studies on Psycho Chihuahua which resulted in positive consumer response.

In March 1997, Taco Bell changed advertising agencies from Bozell to TBWA. Taco Bell commissioned TBWA to create a new advertising campaign for 1998.

Between February and April 1997, Alfaro continued to work with Wrench to develop possibilities for Taco Bell's use of Psycho Chihuahua.

In May 1997, TBWA presented approximately thirty advertising ideas to Taco Bell for its new campaign. One of the ideas involved a male Chihuahua dog passing a female Chihuahua dog to get to Taco Bell food. The executives to which the ideas were presented included Taco Bell's president, Peter Waller, and its chief marketing officer, Vada Hill. Waller and Hill selected TBWA's Chihuahua idea as one of the five advertisements that would be test-marketed during the Summer of 1997. Months later, market research demonstrated favorable results for the TBWA Chihuahua test advertisement and Waller and Hill chose that character as the center of its new advertising campaign starting in January 1998.

Meanwhile, Alfaro believed the character Wrench had created from the original Psycho Chihuahua closely resembled the TBWA Chihuahua to be used in Taco Bell commercials. He alerted Taco Bell's in-house counsel that Wrench would likely sue because of the similarities between the characters. Taco Bell sent a box of Psycho Chihuahua materials to TBWA at some point between June 27, 1997 and July 26, 1997. Alfaro drafted a memorandum that accompanied the materials, describing the parallel path he had taken with Wrench and their idea of using a Chihuahua to advertise Taco Bell food.

By January 1998, Taco Bell began using a Chihuahua to advertise its food. Wrench then sued Taco Bell, claiming that Taco Bell was using Psycho Chihuahua in its advertising without providing compensation to Wrench. *Wrench LLC v. Taco Bell Corp.,* 51 F. Supp. 2d 840 (W.D. Mich. 1999).

In February 1998, Taco Bell and TBWA entered into a joint defense and confidentiality agreement ("Joint Defense Agreement"). They also executed a contract controlling their business relationship ("Agency Agreement"). The Agency Agreement was executed January 19, 1999 but the parties agreed to make the effective date retroactive to April 1, 1997 to include all of TBWA's services to Taco Bell from the beginning of their business relationship.

In its defense in *Wrench*, Taco Bell alleged there was no contract with Wrench because Alfaro had no authority to bind the company, the Chihuahua character used by Taco Bell was not Psycho Chihuahua, and the Chihuahua character used by Taco Bell was independently created by TBWA.

TBWA created and broadcast over forty more Chihuahua commercials between January 1998 and June 2000. In June 2003, the *Wrench* jury determined that Taco Bell had breached an implied contract by using Psycho Chihuahua without compensating Wrench. All copyright claims were dis-

posed of prior to trial. A judgment was entered against Taco Bell in the amount of $30,174,031.00, and the court subsequently amended the judgment to account for pre-judgment and post-judgment interest, bringing the total to over $42,000,000.00.

Taco Bell requested full indemnification from TBWA for its liability to Wrench. Within weeks of the *Wrench* trial, Taco Bell filed this lawsuit against TBWA, suing it for breach of the Agency Agreement, express indemnification, and declaratory relief. Both sides moved for summary judgment. The district court denied Taco Bell's motion and granted TBWA's cross-motion. Summary judgment was entered in favor of TBWA, and this appeal followed.

## II.   *Discussion*

We review de novo the district court's grant of summary judgment. *Universal Health Servs., Inc. v. Thompson,* 363 F.3d 1013, 1019 (9th Cir. 2004).

Taco Bell argues the district court erred in granting summary judgment in favor of TBWA because (1) the *Wrench* verdict established TBWA's fault; (2) TBWA breached the Agency Agreement; (3) TBWA was collaterally estopped from litigating the issue of its fault; and (4) the district court was required to take as true that the Chihuahua character used in Taco Bell's advertising was not independently created by TBWA, confirming fault on the part of TBWA.

Taco Bell relies heavily on TBWA's alleged obligation to indemnify Taco Bell under the indemnification section of the Agency Agreement which states:

> 7.   Indemnification. [TBWA] agrees to exercise its best judgment in the preparation and placing of [Taco Bell's] advertising and publicity, with a view

to avoiding any claims, proceedings, or suits being made or instituted against [Taco Bell] or [TBWA].

7.1     Agency Indemnification. [TBWA] agrees to defend, indemnify, and hold [Taco Bell], its officers, directors, employees and agents . . . harmless from any loss, damage, liability, claim, demand, suit or expense, including reasonable attorneys' fees and costs, that [Taco Bell] may incur or be liable for as a result of any claim, suit or proceeding made, threatened or brought against [Taco Bell] based upon or arising out of (i) any materials created, produced, and/or furnished by [TBWA] for [Taco Bell] (except for claims covered by Paragraph 7.2 below); (ii) [TBWA's] fault or negligence in the performance of its obligations hereunder; or (iii) [TBWA's] breach of its obligations under this Agreement.

7.2     Client Indemnification. [Taco Bell] agrees to defend, indemnify and hold [TBWA], its affiliated companies and their officers, directors, employees and agents . . . harmless from any loss, damage, liability claim, demand, suit or expense, including reasonable attorneys' fees and costs, that [TBWA] may incur or be liable for as a result of any claim, suit or proceeding made, threatened or brought against [TBWA] based upon or arising out of (i) assertions for or descriptions of [Taco Bell's] products or services or any product or service of [Taco Bell's] competitors, in any advertising which [TBWA] may prepare for [Taco Bell], if the assertions or descriptions are based on information or data supplied or approved by [Taco Bell], and such advertising is approved by [Taco Bell] before its release, publication or broadcast; (ii) the nature or use of [Taco Bell's] products or services; (iii) risks which have been brought to the attention of and discussed with [Taco Bell] and [Taco Bell] has nevertheless elected

to proceed as evidenced in writing and signed by either the Vice President of Advertising or Senior Vice President - Marketing of [Taco Bell]; or (iv) [Taco Bell's] fault or negligence. The foregoing notwithstanding, [Taco Bell's] obligation to indemnify, defend, and hold [TBWA] harmless hereunder shall not apply to the extent that damages are incurred as a result of [TBWA's] negligence or failure to properly perform its obligations as provided in this Agreement.[1]

## A.　Wrench *Verdict*

The first issue we consider is whether the *Wrench* jury findings are proof of TBWA's fault, obligating it to indemnify Taco Bell for the liability Taco Bell incurred.

A verdict sheet that was provided to the *Wrench* jury reflects what that jury found:

Question Number 1:　Did Wrench prove by a preponderance of the evidence that Wrench and Taco Bell had a mutual understanding that if Taco Bell used the Psycho Chihuahua character in its advertising and on products, Taco Bell would pay Wrench for this use?

Question Number 2:　Did Wrench prove by a pre-

---

[1]Taco Bell argues that Paragraphs 7.1 and 7.2 of the Agency Agreement provide for proportional cross-indemnification in the event that both parties are at fault. The district court did not address this argument because it found that TBWA was not at all at fault under the given facts, making the argument irrelevant. For the same reason, we will not address the argument here.

ponderance of the evidence
that Taco Bell used the Psy-
cho Chihuahua character in
its advertising from 1997 to
2000 and that the character
used by Taco Bell was not
independently created by
[TWBA]?

Question Number 3:   Did Wrench prove by a pre-
ponderance of the evidence
that it suffered damages
because Taco Bell did not
pay for its use of the Psycho
Chihuahua character?

The *Wrench* jury answered all three questions affirmatively.

According to Taco Bell, these findings are proof of
TBWA's fault. Because TBWA was involved in the creation
of the TBWA Chihuahua character and TBWA had posses-
sion of the Psycho Chihuahua materials, Taco Bell argues the
jury's findings that Psycho Chihuahua was used by Taco Bell
and the character used was not independently created by
TBWA confirms wrongdoing by TBWA. Taco Bell relies
heavily on the second question in the verdict sheet submitted
to the *Wrench* jury, but as to that question, the court in the
*Wrench* trial instructed the jury:

Let me give you some things to consider in deter-
mining whether the Taco Bell Chihuahua is the same
character as the Psycho Chihuahua character . . . .

If you find that the Taco Bell Chihuahua is the same
character as the Psycho Chihuahua character, then
you must still consider whether, on the one hand,
Taco Bell used Wrench's creation of the Psycho Chi-
huahua character or, on the other hand, whether Taco

Bell and [TBWA] created the Taco Bell Chihuahua on an independent creative, but parallel path.

In answering this question, in addition to considering the differences and similarities—differences between and similarities of the two dogs, as I pointed out in the preceding paragraph, you should consider . . . the access or lack thereof to the Psycho Chihuahua character by people at Taco Bell and [TBWA].

**[1]** Considering these instructions to the *Wrench* jury, no inference of fault by TBWA can be drawn from the jury's verdict. The instructions leave unclear what the *Wrench* jury determined on the issue of independent creation of the Chihuahua character. The jury was told to consider "whether Taco Bell and [TBWA] created the Taco Bell Chihuahua on an independent creative, but parallel path." The court also asked the jury to consider "the access or lack thereof to the Psycho Chihuahua character by people at Taco Bell and [TBWA]." The *Wrench* jury was never instructed to differentiate between Taco Bell and TBWA or determine which party was at fault for the liability to Wrench.

**[2]** The undisputed facts do not support a finding of fault or negligence on the part of TBWA. TBWA was not a party to the implied contract between Taco Bell and Wrench and was unaware of its existence. TBWA had no knowledge of Psycho Chihuahua nor Taco Bell's contact with Wrench before proposing a Chihuahua character for Taco Bell advertising on June 2, 1997. The facts that Taco Bell did not have input on TBWA's creation of its advertising character and that a box of Psycho Chihuahua materials was sent to TBWA are of no consequence not only because TBWA created its own Chihuahua character before it received the Psycho Chihuahua materials, but also because Taco Bell was found liable for the use of Psycho Chihuahua without compensating Wrench, not copyright infringement. Taco Bell's arguments

speak to copyright issues not pertinent to this case because those claims were disposed of before trial.

**[3]** The Agency Agreement's indemnification provisions require TBWA to indemnify Taco Bell for liability incurred as a result of "(i) any materials created, produced, and/or furnished by [TBWA] for [Taco Bell] . . . (ii) [TBWA's] fault or negligence in the performance of its obligations hereunder; or (iii) [TBWA's] breach of its obligations under this Agreement." Even if liability arose from "materials created, produced, and/or furnished by [TBWA] for [Taco Bell]," Paragraph 7.1 includes an exception for claims covered by Paragraph 7.2, claims resulting from Taco Bell's fault. Although Taco Bell argues the *Wrench* jury finding warrants an inference that TBWA misappropriated Wrench's material, neither the verdict nor the undisputed facts allow a finding of TBWA's fault, but only Taco Bell's breach of a contract. The district court properly determined no obligation for TBWA to indemnify Taco Bell under the Agency Agreement arose from the verdict.

**[4]** Furthermore, as properly decided by the district court, TBWA cannot be held at fault under the Agency Agreement which allows it to rely on the approval of Taco Bell. Taco Bell approved the Chihuahua character proposed by TBWA and continued to approve the Chihuahua advertisements for broadcasting after the *Wrench* lawsuit was initiated, despite the existence of its implied contractual commitment to Wrench.

**[5]** Taco Bell argues that its approval of advertising created by TBWA was only an approval of costs as provided for in Paragraph 4.1[2] of the Agency Agreement. This argument con-

[2] 4. Approvals and Billing Procedures.

    4.1   Approvals. [TBWA] will obtain [Taco Bell's] prior approval for all work [TBWA] does on [Taco Bell's]

tradicts the statement of Taco Bell's counsel at oral argument of the summary judgment motions in the district court:

> So I would dispute strongly that there was an approval of the ads in the form of agreeing that they go forward and shifting the risk. I wouldn't dispute that there was approval in the sense of, Yes, let's run them. I think we'll sell some more tacos. That, I think there was an approval of.

In addition to the fact that the commercials were broadcast, the admission of Taco Bell's counsel confirmed that Taco Bell approved the Chihuahua commercials for airing. The district court correctly considered Taco Bell's approval to broadcast the Chihuahua commercials after Wrench filed its lawsuit a dispositive factor in Taco Bell's fault-based indemnification claim against TBWA. The admission confirmed that there was approval pursuant to the Agency Agreement's authorization section.

Paragraph 6.4 of the Agency Agreement states:

> 6.4 Authorization. [TBWA] will be entitled to rely and act upon any instruction, approval or authorization given by [Taco Bell] or by any of [Taco Bell's] representatives.

Under this paragraph, TBWA was permitted to rely on Taco Bell's approval of advertising TBWA created.[3] The district

---

> behalf. If [TBWA] believes actual costs for production projects, subject to an estimate, will vary by more than 10%, [TBWA] will send [Taco Bell] a revised estimate for [Taco Bell's] approval. Variances under 10% will be deemed approved by [Taco Bell]. After a project is completed, [TBWA] will reconcile actual costs against the estimates and an appropriate adjustment will be made.

[3]Taco Bell argues that Subparagraph 7.2 (iii) of the Agency Agreement governs approvals and it provides that even if Taco Bell gives approval,

court properly relied on the fact that Taco Bell approved for airing the Chihuahua commercials between January 1998 and June 2000 while denying the existence of its contractual obligation to Wrench. Under the Agency Agreement, TBWA cannot be found at fault for liability arising from advertisements approved by Taco Bell.

## B.  *Agency Agreement*

The next issue we consider is whether TBWA is at fault for breach of the Agency Agreement, leading to Taco Bell's liability in *Wrench.* Subparagraph 7.2(iii) provides that Taco Bell will indemnify TBWA for any liability resulting from "risks which have been brought to the attention of and discussed with [Taco Bell] and [Taco Bell] has nevertheless elected to proceed as evidenced in writing and signed by either the Vice President of Advertising or Senior Vice President - Marketing of [Taco Bell]."

Taco Bell argues that the district court ignored material evidence of TBWA's breach of its obligations under Paragraph 7 to "exercise its best judgment in the preparation and placing of [Taco Bell's] advertising and publicity with a view to avoiding any claims, proceedings, or suits being made or instituted against Taco Bell." It is Taco Bell's position that it was TBWA's responsibility to make sure Taco Bell's advertising campaign did not misuse Psycho Chihuahua and TBWA breached its duty when it failed to do advertising copy clearance, uncover an application for a trademark, and bring risks of using a Chihuahua in advertising to Taco Bell's attention.

---

Taco Bell's obligation does not apply to the extent that damages are incurred as a result of TBWA's negligence or failure to perform its obligations under the Agency Agreement. The claim that Subparagraph 7.2 (iii) governs approval is meritless as there is a specific section speaking directly to approval, Paragraph 6.4, and Paragraph 7.2 speaks only to Taco Bell's indemnification obligations to TBWA.

**[6]** Subparagraph 7.2(iii), speaking to Taco Bell's indemnification obligations to TBWA, does not require any copy clearance, trademark searches, or risk reporting by TBWA, but obligates Taco Bell to indemnify TBWA when Taco Bell elects to proceed in the event that risks are brought to its attention. Additionally, Taco Bell was the party aware of the potential risks of using a Chihuahua character in its advertising. It was Taco Bell that had an undisclosed contract with Wrench and denied the existence of that contract. Taco Bell's argument that TBWA failed to meet an obligation under the Agency Agreement by failing to do copyright and trademark searches is meritless not only because it is not supported by the language in the Agency Agreement, but also because the *Wrench* liability included neither copyright nor trademark damages. As discussed, the entire judgment was based on Taco Bell's breach of an implied contract to pay Wrench for use of Psycho Chihuahua.

## C.  *Issue Preclusion*

Taco Bell argues that TBWA should be precluded from denying that it was at fault and that its fault caused the liability to Wrench. We disagree.

**[7]** The Supreme Court has held that "federal common law governs the claim-preclusive effect of a dismissal by a federal court sitting in diversity." *Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 508 (2001). Federal common law requires application of "the law that would be applied by state courts in the State in which the federal diversity court sits." *Id.* The *Wrench* judgment was rendered by a federal court sitting in diversity in the Western District of Michigan, and the court applied Michigan law. Therefore, any preclusive effect of the *Wrench* jury verdict and judgment is governed by Michigan law. *Id.* at 509.

**[8]** Under Michigan law, three elements must be satisfied for issue preclusion to apply: (1) a question of fact essential

to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel. *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845-46 (Mich. 2004). Estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it had it gone against him. *Id.* at 846-47.

[9] The district court properly found that collateral estoppel did not apply because Taco Bell was at fault in *Wrench* and nothing further could be inferred from the undisputed facts. That court stated:

> TBWA is not bound by the jury verdict in *Wrench.* First, Taco Bell cannot establish an "identity of issues" between the implied-in-fact contract claim in *Wrench* and the fault-based indemnification claim in the current action. Second, Taco Bell failed to show TBWA and Taco Bell were in privity with respect to the *Wrench* action. Thus, application of the estoppel bar would violate TBWA's due process rights. It would be "inequitable" therefore to bind TBWA to the *Wrench* jury findings under these circumstances.

Taco Bell relies on the *Wrench* jury finding that "the Chihuahua used by Taco Bell was not independently created by [TBWA]" in support of its argument that TBWA is collaterally estopped from disputing its fault or negligence. For the reasons discussed above, the jury instructions underlying that finding left doubt as to what the *Wrench* jury decided on the independent creation issue and prevent issue preclusion as to TBWA's asserted fault. The district court correctly reasoned:

> As discussed above Taco Bell seeks to bind TBWA to the portion of the *Wrench* jury's finding that states "that the character used by Taco Bell was not independently created by [TBWA]." However, in the

corresponding jury instruction, the jury was instructed to consider "whether Taco Bell and [TBWA] created the Taco Bell Chihuahua on an independent creative, but parallel path." The court also asked the jury to consider "the access or lack thereof to the Psycho Chihuahua character by people at Taco Bell and [TBWA]." As noted *supra,* the *Wrench* jury was never instructed to determine which party, Taco Bell or TBWA, was at fault for the liability in *Wrench.* At the very minimum, the jury instruction raises a doubt or confusion as to the basis and breadth of the jury's finding that "the character used by Taco Bell was not independently created by [TBWA]." Where doubt exists as to the basis for the jury's finding, collateral estoppel does not apply.

**[10]** The district court's analysis is correct. Considering the instructions given, the *Wrench* jury finding that the character used by Taco Bell was "not independently created by [TBWA]" does not clearly establish what the jury decided on the "independent creation" issue, the issue of fact Taco Bell is attempting to preclude TBWA from contesting. The requirement that the question of fact essential to judgment be actually litigated and determined is, therefore, not met. *See Monat,* 677 N.W.2d at 845.

**[11]** Taco Bell and TBWA also lacked the privity required for issue preclusion. The fault-based indemnification provisions of the Agency Agreement created a direct conflict between Taco Bell and TBWA which prevented Taco Bell from representing TBWA's interests during the *Wrench* trial. This created a due process bar to enforcing issue preclusion against TBWA. The district court properly applied Michigan law regarding the privity requirement for issue preclusion stating:

> Michigan law also requires that, for collateral estoppel to apply, the same parties, or their privies must

have had a full and fair opportunity to litigate the issue to be precluded. *Monat,* 469 Mich. at 682-83, 677 N.W.2d at 845-46. Michigan's Supreme Court held that "[t]o be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the latter litigant is trying to assert." *Adair v. Mich. State,* 470 Mich. 105, 122, 680 N.W.2d 386, 396 (2004), *remanded on other grounds.* Michigan courts have held that application of collateral estoppel is appropriate where there is "substantial identity" between the parties. *Dearborn Heights Sch. Dist. No. 7,* 233 Mich. App. at 126, 592 N.W.2d at 412. "The purpose of the substantial-identity rule is to ensure that collateral estoppel is applied only where the interests of the litigating party are adequately represented in the first proceeding."

**[12]** Taco Bell and TBWA were not in privity in the *Wrench* action because the terms of the Agency Agreement put their interests in conflict. The parties' acknowledgment of their "mutuality of interest in a common defense" of the *Wrench* claims in the Joint Defense Agreement does not overcome the conflict created by the Agency Agreement. Under Paragraphs 7.1 and 7.2, TBWA had no indemnification obligation for any liability resulting from Taco Bell's fault or negligence, but Taco Bell was entitled to indemnification from TBWA for any liability resulting from TBWA's fault or negligence. Given that conflict of interest, the district court properly determined that Taco Bell could not have adequately represented TBWA's interests in *Wrench.* Holding the *Wrench* verdict binding on TBWA would be a due process violation.

## D. *California Civil Code § 2778(6)*

**[13]** Taco Bell contends the district court was required to take as true that TBWA did not independently create its Chihuahua character. California Code § 2778(6) states:

In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears:

. . . .

(6)   If the person indemnifying, whether he is a principal or a surety in the agreement, has not reasonable notice of the action or proceeding against the person indemnified, or is not allowed to control its defense, judgment against the latter is only presumptive evidence against the former;

. . . .

**[14]** Section 2778(6) does not apply here. TBWA is not an indemnitor under the undisputed facts of this case because no fault or negligence of TBWA caused the duty to indemnify to arise. Taco Bell's argument assumes the *Wrench* verdict established TBWA's fault but, as previously discussed, it did not. Therefore, TBWA does not constitute an "indemnifying person" and § 2778(6) does not apply.

### III.    Conclusion

The district court properly concluded there is evidence only of Taco Bell's fault in its liability to Wrench. As a result, no indemnification obligation from TBWA to Taco Bell arose.

**AFFIRMED.**